## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

| | |
|---|---|
| MALLORY ADDINGTON, ET AL. | CIVIL ACTION NO. 18-1116 LEAD |
| VERSUS | JUDGE ELIZABETH E. FOOTE |
| BAYOU DORCHEAT CORRECTIONAL CENTER, ET AL. | MAGISTRATE JUDGE HORNSBY |

### <u>MEMORANDUM RULING</u>

This matter arises from the custodial death of Joshua Addington ("Addington") from diabetic complications while he was incarcerated at Bayou Dorcheat Correctional Center ("BDCC"). Plaintiffs Mallory, Landon, and Cody Addington (collectively, "Plaintiffs") filed this suit on behalf of Addington, their father, alleging that his death resulted from violations of the Eighth Amendment of the United States Constitution and Louisiana law. Before the Court is a motion for summary judgment, filed by Defendants Webster Parish Sheriff Gary Sexton, Warden John Lewis, Nurse Debra Claunch, and Sergeant Damion Wells (collectively, "Defendants").[1] The motion has been fully briefed. For the reasons below, Defendants' motion [Record Document 80] is **GRANTED IN PART** and **DENIED IN PART**.

### <u>BACKGROUND</u>

Addington, age 40 at the time of his death, was diagnosed with Type II diabetes in his mid-20s. Record Document 80-2 ¶¶ 1–2. Type II diabetes is a disease in which the pancreas does not produce adequate amounts of insulin.[2] When blood-glucose concentrations rise above the normal

---

[1] Defendant Dr. Frederick Heard did not join in this motion for summary judgment. The Court also notes that BDCC and Unknown Agents of BDCC and Webster Parish Sheriff's Department should be terminated as defendants per Record Document 7.
[2] *What is Diabetes?*, CDC (last visited Mar. 24, 2022), https://www.cdc.gov/diabetes/basics/diabetes.html.

range,[3] a person could experience a serious condition known as hyperglycemia. High blood sugar can make a person feel "very tired."[4] Often, a diabetic's blood-glucose levels are reduced by insulin injections.[5] "Over time, high blood sugar can lead to long-term, serious health problems."[6] A lack of insulin can cause a person to have high ketones, and "[w]hen too many ketones are produced too fast, they can build up in [a] [person's] body and cause diabetic ketoacidosis, or DKA," which "can cause a coma or even death."[7] Two common symptoms of DKA are "thirst that lasts for a day or more" and "nausea and vomiting."[8]

Another serious concern for diabetics is hypoglycemia, which is a condition where a diabetic's blood-glucose levels drop below the normal range.[9] If a diabetic's insulin is too low, receiving too much insulin could trigger hypoglycemia. Sugary foods or glucose tablets are often used to help raise a diabetic's blood glucose to combat hypoglycemia. If untreated, hypoglycemia can become severe and cause serious adverse health consequences, such as death.[10]

BDCC is a medium-security jail in Webster Parish, Louisiana. During the relevant time period for this suit, BDCC employed one licensed nurse, Defendant Debra Claunch ("Claunch" or "Nurse Claunch"), who worked Monday through Friday. As a Licensed Practical Nurse, Claunch is required to operate under the care of a licensed physician. BDCC employed one physician,

---

[3] After an overnight fast, the normal blood-glucose range is below 100 mg/dL. *See Diabetes Tests*, CDC (last visited Mar. 24, 2022), https://www.cdc.gov/diabetes/basics/getting-tested.html.  The target range for a diabetic is between 80 to 130 mg/dL before a meal and below 180 mg/dL two hours after the start of a meal. *See Manage Blood Sugar*, CDC (last visited Mar. 24, 2022), https://www.cdc.gov/diabetes/managing/manage-blood-sugar.html.  This  range  could  differ depending on the age and other health problems of the individual.
[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] "Blood sugar below 70 mg/dL is considered low." *Id.*
[10] *Id.*

Defendant Dr. Frederick Heard ("Dr. Heard"), who visited BDCC about once a week, which was usually on a Wednesday.

Addington arrived at BDCC via a prison transfer from Bossier Parish on Saturday, March 17, 2018. Record Document 89-1 ¶ 1. Upon intake at BDCC, a non-medical official performed Addington's health screening at which time Addington reported that he had Type II diabetes. Record Document 80-4 at 23. The intake health screening form indicated that Addington reported that he had no history of alcohol or drug abuse or hospitalizations that BDCC staff needed to be aware of.[11] *Id.* The medical transfer form, which accompanied Addington, noted that he was prescribed 20 units of Novolin 70/30 insulin shots to be administered twice per day—morning and evening. *Id.* at 6–7. Addington signed a form indicating that he received a copy of the offender handbook. *Id.* at 20. Also, this acknowledgement form provided notice that medical staff was available Monday through Friday and was always on-call for emergencies and that if an inmate desired to see medical personnel, the proper procedure was to submit an inmate medical evaluation form. *Id.*

Because Addington arrived on a Saturday, Nurse Claunch was not scheduled to work until Monday. However, a deputy called and notified her that BDCC had received a diabetic inmate with insulin medication. Record Document 80-16 at 6–7. Nurse Claunch went to BDCC that Saturday to prepare Addington's insulin. It was the normal practice at BDCC to pre-prepare multiple syringes with the prescribed dosage of insulin and securely store them in a patient-specific bag in the refrigerator at the nurse's station. *Id.* at 6. It was normal practice to inform the inmate that it was

---

[11] Addington's full medical records make clear that this was not true. It is undisputed that Addington's full medical records show that he had an extensive history of hospitalizations for hypoglycemic and hyperglycemic episodes from uncontrolled diabetes.

his responsibility to check his own blood-glucose levels and to self-administer the insulin shots under the supervision of an officer.[12] *Id.*; Record Document 80-17 at 8–9.

At BDCC, the typical way for an inmate to gain access to the blood-glucose testing equipment and/or his insulin shots was to approach the Key Room and notify the Key Officer of such needs. Record Document 80-23 at 12. An inmate in BDCC's dormitory could approach the Key Room at will. *Id.* A diabetic inmate was given access to blood-glucose testing equipment in the Key Room and at the nurse's station; the inmate could check his blood glucose at either location under the supervision of an officer. *Id.* After the inmate notified the Key Officer of the need for an insulin shot, a separate officer would then accompany the inmate to the nurse's station and monitor the inmate as the inmate self-administered the insulin shot. *Id.* The observing officer would then radio the Key Room and Master Control and inform the officers at both stations of the blood-glucose reading and whether or not a shot was given. The Key Officer and the officer in Master Control typically documented the information in the Key Log Book and Master Control Log Book, respectively. *Id.*

Prison records show that on March 21, 2018, Addington suffered a mild hypoglycemic event when his blood glucose was 58 mg/dL. Record Document 25 at 13. After notifying deputies, he was provided with a snack, which stabilized his blood glucose. *Id.* On March 22, 2018, Addington submitted an Inmate Medical Evaluation Request form in which he requested a diabetic snack at night. Record Document 80-4 at 26–27. Nurse Claunch approved this request the following day. *Id.* There is no evidence that Addington submitted other medical request forms or filed any grievances regarding his medical care while at BDCC.

---

[12] Although Plaintiffs challenge this practice at BDCC, they have not presented evidence that BDCC departed from this practice in Addington's case.

On Friday, March 30, 2018, Addington had a significant hypoglycemic event. Record Documents 80-4 at 29; 80-24 at 62; & 80-25 at 38. The Log Books reveal that Addington had a blood-glucose level of 143 mg/dL at 3:00 a.m. and took an insulin injection. Record Documents 80-24 at 61 & 80-25 at 37. At 8:00 a.m., Addington was found passed out in the dormitory. Record Documents 80-4 at 29 & 80-24 at 62. Deputies administered a blood-glucose test, which showed that he was experiencing a hypoglycemic event. Record Documents 80-4 at 29 & 80-24 at 62. Deputies then administered Addington glucose paste and took him to the medical station. Record Documents 80-4 at 29 & 80-24 at 62. After his blood-glucose levels continued to drop, the deputies contacted Nurse Claunch, who was not scheduled to work, as it was Good Friday. Record Documents 80-4 at 29 & 80-24 at 62. Nurse Claunch instructed them to take Addington to the hospital. *Id.* An ambulance transported Addington to Minden Medical Center ("MMC") where he was treated for hypoglycemia and received chest x-rays for chest pain. *Id.*

While at MMC, the hospital staff administered the drug Gabapentin, an anticonvulsant or antiepileptic drug, which also can treat diabetic neuropathy. Record Document 80-6 at 14. After about two hours, the hospital discharged Addington in stable condition without further instructions other than to follow up as needed with a private physician and to liberalize his diet. *Id.* at 14–17. The discharge papers listed critical glucose levels as being below 50 mg/dL or above 400 mg/dL. *Id.* at 17. The treating doctor wrote a prescription for Gabapentin for Addington to take orally twice a day. *Id.* at 14; Record Document 80-4 at 35. Accompanying the discharge instructions were informationals on cervical radiculopathy, hypoglycemia, and Gabapentin. Record Document 80-4 at 40–46. In her deposition, Nurse Claunch testified that an accompanying deputy typically received the discharge instructions and placed them in her mailbox for her review upon her return to work. Record Document 89-5 at 11–12.

About two hours after his return from MMC, Addington was transferred to a holding cell for medical observation. Record Documents 80-24 at 62–70 & 80-23 at 13. The medical observation cells are equipped with live-feed cameras; the cells are also equipped with a buzzer to alert officers of any medical needs. Record Documents 80-16 at 13; 80-17 at 11; 80-18 at 8; & 80-23 at 13. Later that day, Addington registered a fever of 101.2 degrees Fahrenheit. Record Document 89-8 at 2. On March 31, 2018, the following day, prison records show that Addington's fever decreased to 99 degrees Fahrenheit and BDCC staff gave him medication for nausea. Record Documents 80-24 at 67 & 89-8 at 3. Further, the same day, Addington's blood-glucose readings were elevated above the normal range: 284, 364, 309, and 274 mg/dL. Record Document 89-13. Defendant Sergeant Damion Wells ("Sergeant Wells") prepared an Unusual Occurrence Report to document Addington's high blood-glucose readings, but he did not notify medical personnel. *Id.*

At 6:15 a.m. on April 1, 2018, approximately 48 hours after returning from the hospital, Addington logged an elevated blood-glucose reading of 366 mg/dL and asked Deputy Wendell Wright for water, which was provided to him.[13] Record Documents 80-24 at 68 & 89-14. Shortly after, Addington refused his morning meal. Record Documents 80-19 at 7 & 89-15. At 1:21 p.m., Master Control asked Deputy David Edwards to check Addington's blood-glucose levels. Record Documents 80-22 at 8–9 & 89-16. When Deputy Edwards arrived at Addington's observation cell, he found Addington laying on his right side, unresponsive to attempts to wake him. Deputy Edwards did not detect a carotid pulse. Record Document 89-16. Deputy James Guidry, who was assisting Deputy Edwards, then checked for a pulse and listened for a heartbeat. Deputy Guidry stated that he heard a faint heartbeat, so the officers refrained from attempting CPR and instead rolled

---

[13] Plaintiffs attempt to dispute this fact, but they have not produced competent summary judgment evidence to controvert this fact.

Addington to a supine position at which time they noticed that Addington had urinated and defecated on himself. *Id.* Deputy Edwards then attempted to administer oxygen by bag valve, but there was no oxygen in the bottle. He attempted to manually open Addington's airway, but Addington's head and neck were stiff. *Id.* At 1:38 p.m., BDCC staff called an ambulance, and the EMTs pronounced Addington dead upon their arrival at 1:55 p.m. *Id.* Addington's autopsy report listed his cause of death as acute renal failure due to Diabetic Ketoacidosis complicating Hypertensive Cardiovascular Disease. Record Documents 80-28 & 89-17. This suit followed.

Plaintiffs sued Defendants in their official and individual capacities, alleging that they violated Addington's Eighth Amendment right to be free from cruel and unusual punishment. Record Document 58. Additionally, Plaintiffs allege that Defendants provided Addington unreasonable medical care in violation of Louisiana law. *Id.* Defendants deny Plaintiffs' allegations and counter that Addington was to blame for his demise because he failed to manage his diabetes. Defendants have moved for summary judgment on all claims, and they have asserted qualified immunity as a defense against all individual capacity claims. Record Document 80.

## <u>SUMMARY JUDGMENT STANDARD</u>

Federal Rule of Civil Procedure 56(a) directs a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is appropriate when the pleadings, answers to interrogatories, admissions, depositions, and affidavits on file indicate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When the burden at trial will rest on the non-moving party, the moving party need not produce evidence to negate the elements of the non-moving party's case; rather, it need only point out the absence of supporting evidence. *See id.* at 322–23.

If the movant satisfies its initial burden of showing that there is no genuine dispute of material fact, the non-movant must demonstrate that there is, in fact, a genuine issue for trial by going "beyond the pleadings and designat[ing] specific facts" for support. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Celotex*, 477 U.S. at 325). "This burden is not satisfied with some metaphysical doubt as to the material facts," by conclusory or unsubstantiated allegations, or by a mere "scintilla of evidence." *Id.* (internal quotation marks and citations omitted). However, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1985) (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). While not weighing the evidence or evaluating the credibility of witnesses, courts should grant summary judgment where the critical evidence in support of the non-movant is so "weak or tenuous" that it could not support a judgment in the non-movant's favor. *Armstrong v. City of Dall.*, 997 F.2d 62, 67 (5th Cir. 1993).

Additionally, Local Rule 56.1 requires the movant to file a statement of material facts as to which it "contends there is no genuine issue to be tried." The opposing party must then set forth a "short and concise statement of the material facts as to which there exists a genuine issue to be tried." W.D. La. R. 56.2. All material facts set forth in the movant's statement "will be deemed admitted, for purposes of the motion, unless controverted as required by this rule." *Id.*

## LAW & ANALYSIS

### I.    Objection to Expert Reports of Dr. Timothy Hughes

Plaintiffs submitted two unsworn reports by Dr. Timothy Hughes in connection with their opposition to Defendants' motion for summary judgment. Record Documents 89-9 & 89-18. Plaintiffs often rely on these two reports throughout their opposition in an attempt to create a dispute of material fact. *See generally* Record Document 89. Defendants object to Plaintiffs' inclusion of

and reliance on these two unsworn reports under Federal Rule of Civil Procedure 56(c)(2). Record Document 91 at 10. Defendants contend that these unsworn reports should not be considered because they are hearsay and cannot be presented in a form that would be admissible in evidence. *Id.* Defendants are correct that "[u]nsworn expert reports . . . do not qualify as affidavits or otherwise admissible evidence for [the] purpose of Rule 56, and may be disregarded by the court when ruling on a motion for summary judgment." *Provident Life & Acc. Ins. Co. v. Goel*, 274 F.3d 984, 1000 (5th Cir. 2001) (citation omitted). Considering that the reports are unsworn, Defendants' objection is **SUSTAINED**, and the Court will not consider them.

## II.     <u>Individual Capacity Claims</u>

Title 42, United States Code, Section 1983 provides a federal cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States against any person acting under color of state law. 42 U.S.C. § 1983. Section 1983 does not create substantive rights but provides remedies to the rights established in the United States Constitution and other federal laws. *See Graham v. Connor*, 490 U.S. 386, 393–94 (1989); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). To assert a claim for damages under this statute, a plaintiff must demonstrate "(1) a deprivation of a right secured by federal law, (2) that occurred under color of state law, and (3) was caused by a state actor." *Victoria W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004). Nonetheless, the doctrine of qualified immunity shields government officials from liability for claims against them in their individual capacities "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This protection exists to balance "the need to hold public officials accountable when they exercise power irresponsibly and

the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

The issue of whether qualified immunity applies should be resolved at the earliest possible stage in the litigation. *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011). While qualified immunity is technically an affirmative defense, it is the plaintiff's burden to negate the defense once it has been raised. *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012). The defense of qualified immunity requires the Court to make a two-part inquiry: (1) whether the facts alleged or shown by the plaintiff demonstrate a violation of a constitutional right, and (2) if a violation has been established, whether the official's actions were objectively reasonable in light of clearly established law at the time of the alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). A court may begin its analysis of qualified immunity with either prong. *Gibson v. Kilpatrick*, 773 F.3d 661, 666 (5th Cir. 2014).

Because Plaintiffs' claims arise out of events that occurred while Addington was incarcerated, the constitutional right at issue in this case derives from the Eighth Amendment, which "dictates that cruel and unusual punishment shall not be inflicted" upon prisoners. *Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004). The Court must consider whether, viewing all facts in the light most favorable to Plaintiffs, Defendants' actions or inactions violated Addington's right to be free from cruel and unusual punishment. If Plaintiffs establish such violation, the Court will then analyze whether the right was clearly established at the time of Defendants' alleged misconduct.

### A. Eighth Amendment

The Eighth Amendment provides that "[p]rison officials must provide humane conditions of confinement; they must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measure to ensure the safety of the inmates." *Id.* In *Estelle v. Gamble*,

the Supreme Court held that "deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983" because it "constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." 429 U.S. 97, 104–05 (1976) (internal quotation marks and citation omitted). A prison official acts with deliberate indifference when the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Thus, to prevail on an Eighth Amendment claim, a plaintiff must demonstrate (1) that "the alleged deprivation was objectively serious, exposing him to a substantial risk of serious harm and resulting in the denial of the minimal civilized measure of life's necessities" and (2) that the prison official "possessed a subjectively culpable state of mind in that he exhibited deliberate indifference to serious medical needs." *Arenas v. Calhoun*, 922 F.3d 616, 620 (5th Cir. 2019) (internal quotation marks and citations omitted).

"Deliberate indifference is an extremely high standard to meet." *Id.* (citation omitted). "A prison official displays deliberate indifference only if he (1) 'knows that inmates face a substantial risk of serious bodily harm' and (2) 'disregards that risk by failing to take reasonable measures to abate it.'" *Arenas*, 922 F.3d at 620 (quoting *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006)). An obvious risk could be sufficient to allow a fact finder to conclude that prison officials knew of the risk. *Hinojosa v. Livingston*, 807 F.3d 657, 667 (5th Cir. 2015) (citing *Gates*, 376 F.3d at 340); *see Farmer*, 511 U.S. at 842; *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999).

"Medical treatment that is merely unsuccessful or negligent does not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Arenas*, 922 F.3d at 620 (internal quotation marks and citations omitted). "Rather,

an inmate must show that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* at 620–21 (internal quotation marks and citations omitted).

Plaintiffs claim that Defendants were deliberately indifferent in the following ways: (1) Nurse Claunch failed to request Addington's complete medical files; (2) Defendants denied Addington his insulin; (3) Defendants ignored Addington's medical complaints after his discharge from MMC; (4) Defendants ignored Addington's discharge instructions from MMC; and (5) Defendants delayed treatment as Addington died in his cell. Record Document 89 at 12–18. The Court will address each claim in turn.

### i. Nurse Claunch

According to Plaintiffs, BDCC has a procedure that allows for Nurse Claunch to request an inmate's medical records from a prior facility; to obtain an inmate's medical records, an inmate must first sign a Release of Information ("ROI"). Record Document 89 at 12–13. It was Nurse Claunch's failure to obtain an ROI and request Addington's medical records from Bossier Parish that Plaintiffs contend constitutes deliberate indifference. *Id.* In support, they cite to an Eleventh Circuit case for the proposition that "deliberate indifference may be established by a showing of grossly inadequate care as well as by a decision to take an easier but less efficacious course of treatment." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). Plaintiffs maintain that Nurse Claunch chose an easier but less efficacious course of treatment. The Court disagrees.

The Court begins by noting that Plaintiffs' deliberate indifference standard has not been applied in the Fifth Circuit. It is well settled in the Fifth Circuit that "even a grossly negligent response to a substantial risk of serious harm" does not constitute deliberate indifference. *Williams*

*v. Banks*, 956 F.3d 808, 811 (5th Cir. 2020) (citation omitted). "Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference." *Gobert*, 463 F.3d at 346. "Rather, an inmate must show that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Arenas*, 922 F.3d at 620–21 (internal quotation marks and citations omitted).

Here, the facts do not support a finding of deliberate indifference on the part of Nurse Claunch regarding the request of medical records. Upon Addington's intake, Nurse Claunch was notified that BDCC received a diabetic inmate and came to BDCC that same day to fill Addington's insulin syringes, despite not being scheduled to work. Notably, Addington never informed BDCC officials that he struggled to control his diabetes and had been hospitalized on multiple occasions for hypoglycemia and hyperglycemia, nor did Addington ever request medical assistance or request a visit with medical regarding his diabetes management. The only medical request form filled out by Addington was for an evening snack, which Nurse Claunch promptly granted. Plaintiffs have not presented any reason that Nurse Claunch would have had to immediately request Addington's full medical records, nor have they cited the Court to any authority that holds that the Eighth Amendment requires prison officials to immediately request the full medical records of all inmates regardless of need.[14] Simply put, Plaintiffs have failed to come forward with any evidence that Nurse Claunch "refused to treat [Addington], ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any

---

[14] *McElligott*, the sole case cited by Plaintiffs in this section of their brief, contains no such discussion.

serious medical needs." *Id.* (internal quotation marks and citations omitted). Accordingly, Plaintiffs have failed to establish an Eighth Amendment violation as to this claim.

ii. <u>Addington's Access to Insulin</u>

Next, based on an incomplete Medical Administration Record ("MAR"), Plaintiffs contend that Addington was denied insulin on multiple occasions. Record Document 89 at 13. According to Plaintiffs, "it can be reasonably presumed that Joshua Addington missed four morning doses and ten evening doses of his insulin as they were not documented in his [MAR]." *Id.* Defendants acknowledge that the MAR was incomplete but cited the Court to log books that noted that Addington received some insulin shots not documented in the MAR. Record Document 91 at 5.

Setting aside the spotty record keeping at BDCC, it is undisputed that BDCC staff did not administer insulin to Addington or any inmate at BDCC. What the evidence does show is that BDCC placed the burden on Addington to properly manage his day-to-day administration of insulin and that on multiple occasions, Addington did test his glucose and self-administer insulin shots. Indeed, it appears that Addington tested his glucose at least once every day, except on March 27, 2018. *See id.*; Record Document 80-12 at 22. Plaintiffs have come forward with no evidence that an officer refused, denied, or delayed Addington's access to blood-glucose testing equipment or his insulin shots prior to his hospitalization on March 30, 2018.[15] The fact that Addington's MAR was not properly filled out played no role in Addington's access to glucose testing equipment or his insulin injections.

Plaintiffs take issue with BDCC requiring Addington "to seek out his medication himself" instead of having BDCC staff bring it to him. Record Document 89 at 14. However, merely

---

[15] Notably, Plaintiffs do not individually identify any Defendant who allegedly violated Addington's Eighth Amendment right regarding Addington's access to his insulin prior to March 30, 2018, but, instead, group them together in a conclusory fashion.

disagreeing with "a treatment regimen is not sufficient to establish a claim of deliberate indifference." *Banks v. LeBlanc*, No. CV 16-649-JWD-EWD, 2019 WL 4315018, at *4–5 (M.D. La. Aug. 27, 2019*), report and recommendation adopted*, No. CV 16-649-JWD-EWD, 2019 WL 4307873 (M.D. La. Sept. 11, 2019); *Gobert*, 463 F.3d at 346. Placing the burden on an inmate to manage his diabetes and self-administer insulin injections is a matter of medical discretion and does not constitute deliberate indifference absent evidence that staff knew of and ignored an inmate's inability to do so. *See Banks*, 2019 WL 4315018, at *5; *Gobert*, 463 F.3d at 346; *Baughman v. Seale*, 761 F. App'x 371, 379–80 (5th Cir. 2019). Here, prior to his hospitalization on March 30, 2018, there is no evidence that Addington was incapable of seeking out his medication, nor is there evidence that Addington requested for insulin to be brought to him because of an infirmity.

Plaintiffs also maintain that requiring Addington to request his insulin medication violates jail policies. However, this statement mischaracterizes BDCC policy. BDCC's policy states that "[m]edications will be administered according to doctor's instructions only" and that officers should ensure "offenders receive their medications according to doctor's instructions." Record Document 89-7 at 2–3. These generic statements of policy in no way force officers to provide insulin at pill call instead of requiring an inmate to go to the nurse's station to self-administer insulin shots. Even if Defendants violated a policy, Fifth Circuit case law is clear that "a prison official's failure to follow the prison's own policies, procedures or regulations does not constitute [deliberate indifference], if constitutional minima are nevertheless met." *Myers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir. 1996).

Ultimately, Plaintiffs have failed to come forward with any evidence that shows Addington did not have constant access to blood-glucose testing equipment and his insulin shots upon request prior to March 30, 2018. Plaintiffs' "disagreement with the ways in which insulin [was] [provided]

to" Addington does not support a finding of deliberate indifference. *Banks*, 2019 WL 4315018, at *5; *see Gobert*, 463 F.3d at 346. Consequently, Plaintiffs' Eighth Amendment claim fails in this regard.

### iii.   Medical Complaints after Addington's Discharge from MMC

Plaintiffs allege that Sergeant Wells was deliberately indifferent by ignoring Addington's medical complaints after he was discharged from MMC on March 30, 2018. Record Document 89 at 15–16.

The evidence shows that shortly after Addington's return from MMC, he started "having problems again" and then Sergeant Wells transferred Addington into a medical observation cell; these cells are located near the nurse's station and are equipped with a live-feed camera and a buzzer for an inmate to use to alert staff that he needs help. *See* Record Document 89-8 at 2. The same day as his return from MMC, Addington recorded a fever of 101.2 degrees Fahrenheit. Although a fever may require obvious medical care, there is no evidence that the fever was such a concern to require immediate medical care other than further observation. Indeed, the fever reduced to 99 degrees Fahrenheit by the next day, and there is no evidence that Addington requested treatment for the fever or filled out a medical request form or grievance regarding his fever. Plaintiffs thus mischaracterize the evidence in stating that Sergeant Wells ignored a medical complaint regarding a fever.

However, the events from March 31, 2018 to April 1, 2018, require closer examination. On March 31, 2018, Sergeant Wells created an Unusual Occurrence Report ("UOR") in which he documented that Addington's blood-glucose levels registered 284, 364, 309, and 274 mg/dL throughout the day, but he did not convey his concerns to Nurse Claunch or Dr. Heard. Indeed, neither Nurse Claunch nor Dr. Heard worked at BDCC on the weekends. Additionally, on the same

day, the Master Control Log Book reflects that Addington received medication for nausea at 1:09 p.m. As stated above, high blood sugar and nausea are warning signs of DKA. There is no record of Addington receiving insulin from March 31, 2018 to April 1, 2018, despite Addington having high glucose levels.

On the morning of April 1, 2018, Sergeant Wells directed Deputy Wendell Wright to check on Addington. Record Document 80-20 at 8. At 6:15 a.m., Addington logged an elevated blood-glucose reading of 366 mg/dL and asked Deputy Wright for water, which was provided to him.[16] Record Documents 80-24 at 68 & 89-14. Deputy Wright brought Addington a second cup of water about one hour later. Record Document 89-14. As previously stated, thirst is a symptom of high blood sugar and a warning sign of DKA.

At about 9:30 a.m., Addington refused his morning meal. Record Documents 80-19 at 7 & 89-15. Addington was found unresponsive in his cell shortly after 1:21 p.m. Record Document 89-16. There is no evidence that Addington was checked on between 9:30 a.m. and 1:21 p.m. Additionally, there is no evidence that Addington received any insulin between his discharge from the hospital and his death. The MAR shows that the last dose of insulin Addington received at BDCC occurred the morning of March 30, 2018, which was prior to his hospitalization. Record Document 89-6.

---

[16] Plaintiffs attempt to challenge this documentary evidence by citing to the autopsy report. The autopsy report shows that Addington had 50 mL of liquid in his stomach. Record Documents 80-28 at 5 & 89-17 at 4. Plaintiffs allege that this "lack of liquid shows BDCC's deliberate indifference in regards to Joshua Addington's medical needs." Record Document 89 at 16. Plaintiffs aver that it should be presumed that he was not supplied water or supplied an insufficient amount of water based on the autopsy report. However, Plaintiffs have not cited the Court to any evidence upon which to base this scientific assertion. The Court will make no such assumptions without competent summary judgment evidence supporting such contention.

When looking at the timeline of events, from March 31, 2018 to April 1, 2018, Addington's blood-glucose readings were alarmingly high and approaching critical levels, if not already there. There is no question that Addington faced a substantial risk of serious harm from these elevated blood-glucose levels, such as falling into a coma and/or death, and that not receiving medical attention was objectively serious. *See Gobert*, 463 at 345 n.12 ("A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required."). The question remains whether Sergeant Wells had the necessary culpable state of mind and disregarded that risk by failing to take reasonable measures to abate it. *See Arenas*, 922 F.3d at 620. As to this inquiry, the Court finds that there is a dispute of material fact that precludes summary judgment.

When viewing the evidence in a light most favorable to Plaintiffs, based on the above facts, a jury could reasonably conclude that Sergeant Wells subjectively knew Addington faced a substantial risk of harm because of the obvious nature of the risk. As Warden Lewis stated in his deposition, it was "common sense" that these readings were "abnormal." Record Document 80-17 at 8. Moreover, a jury could reasonably infer that Sergeant Wells knew that something was wrong with Addington by the fact that he created a UOR detailing Addington's high blood-glucose readings. Despite these concerns, a jury could reasonably conclude that Sergeant Wells chose not to take any action to alleviate the risk, such as contacting medical personnel or ensuring that Addington's insulin was administered. Notably, the MAR does not reflect that Addington refused his insulin during this time. *Id.* at 9; Record Document 89-6. Thus, viewing the evidence in a light most favorable to Plaintiffs, as the Court must at the summary judgment stage, a jury could reasonably conclude that Sergeant Wells showed "a wanton disregard" to Addington's obvious medical needs. *Gobert*, 463 F.3d at 346.

The next step in the qualified immunity analysis requires Plaintiffs to establish whether the right was clearly established. Although the parties do not dedicate a substantial portion of their briefs to this issue, the Court concludes that an inmate's right to adequate medical care was clearly established at the time of this incident and that prison officials were on notice that they cannot show a wanton disregard to an inmate in obvious medical need. *Gobert*, 463 F.3d at 345 (citing *Estelle*, 429 U.S. at 104); *see Harris*, 198 F.3d at 159–60; *Fielder v. Bosshard*, 590 F.2d 105 (5th Cir. 1979).

In sum, Plaintiffs have created a dispute of material fact as to whether Sergeant Wells violated Addington's right to be free from cruel and unusual punishment by showing "a wanton disregard" to Addington's medical needs. *Gobert*, 463 F.3d at 346. Here, a jury could reasonably find that Sergeant Wells (1) knew Addington was an insulin-dependent diabetic; (2) knew Addington had alarmingly high glucose levels; (3) knew of "or should have been aware, because it was so obvious, of an unjustifiably high risk to [Addington's] health"; and (4) "did nothing to seek medical attention" for Addington. *Dyer v. Houston*, 964 F.3d 374, 385 (5th Cir. 2020) (citations omitted) (citing pre-2018 cases for clearly established law). Accordingly, Sergeant Wells is not entitled to qualified immunity at this stage.

### iv.   Addington's Discharge Instructions from MMC

Plaintiffs claim that "Defendants also ignored Joshua Addington's discharge instructions from [MMC]." Record Document 89 at 16. They cite to the fact that Deputy James Guidry placed the instructions in Nurse Claunch's work mailbox on March 30, 2018, despite knowing that she was not returning to BDCC until Monday, April 2, 2018. Plaintiffs contend that there is no evidence that Addington received his insulin shots,[17] received his Gabapentin prescription, received a less

---

[17] Plaintiffs' brief specifically claims that Joshua Addington's discharge instructions from MMC included a directive that he was "to continue taking insulin before breakfast and after supper." Record Document 89 at 16. To back up this assertion, Plaintiffs cite "Ex. J #1420 and #1426."

restrictive diet, or had snacks available every four hours.[18] However, these allegations are not supported by the evidence.

First, Plaintiffs group Defendants together in a conclusory fashion and fail to individually identify a Defendant who was deliberately indifferent in this regard. Notably, the part of Nurse Claunch's deposition cited by Plaintiffs does not establish that Deputy Guidry actually placed the instructions in Nurse Claunch's mailbox. *See* Record Document 89-5 at 11–12. Instead, it establishes that Deputy Guidry followed the ambulance and that the normal procedure was that a deputy also received the discharge instructions from the hospital and then placed it in her box for her review. *Id.* Although one may assume that normal procedures were followed in this case, the deposition stops short of establishing that fact. *Id.* Moreover, even if the Court were to accept this fact, Deputy Guidry is not a Defendant, and there is no evidence that Deputy Guidry relayed this information to a named Defendant.[19]

---

Plaintiffs do attach the MMC records for March 30, 2018 at Record Document 89-11. However, those records do not contain pages with the bates numbers of 1420 or 1426. Instead, the only pages attached are page numbers 1428 through 1434. The Court cannot find within these pages any reference to a discharge instruction that the deceased was prescribed insulin or specifically ordered to continue taking it. Instead, insulin "before breakfast and after supper" is mentioned on page 1428 in the section entitled "Historical." The Court was able to locate the pages in Record Document 80-6, but the Court still found no specific directive for Addington to continue taking insulin. Nonetheless, it is undisputed that the deceased was an insulin-dependent diabetic both before and after his admission to MMC. Plaintiffs' counsel is cautioned to show more care in its representations to the Court.

[18] In support of the proposition that Addington was to receive snacks every four hours, Plaintiffs cite to documents with bates numbers of 1420 and 1426 in their Exhibit J. *See* Record Document 89-11. As stated above, these pages are not included in Exhibit J. The Court was able to locate the cited documents in Record Document 80-6. However, the Court does not see an instruction for Addington to receive snacks every four hours on those pages. Although it appears to the Court that this fact is not in evidence, the Court will assume *arguendo* that this fact is in evidence because the Court ultimately rejects Plaintiffs' argument.

[19] The Court notes that Deputy Guidry was deposed in this case, but Plaintiffs do not cite to his deposition to establish the facts surrounding what happened to the discharge instructions after Addington's discharge from MMC. *See* Record Document 80-21.

Second, Plaintiffs have failed to come forward with any evidence that Defendants did not administer Addington a proper diabetic diet, nor have they produced evidence showing that Addington did not have access to diabetic snacks.[20]

Lastly, although there is no evidence that Addington received his Gabapentin prescription after his initial dose at the hospital on March 30, 2018, Plaintiffs have failed to assert any facts upon which a factfinder could find any of the named Defendants responsible for this alleged deprivation. Further, Plaintiffs have failed to produce any evidence showing that Addington's alleged failure to receive Gabapentin from March 31, 2018 to April 1, 2018, was objectively serious or posed a substantial risk of serious harm.[21] *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993) (holding a "delay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference, which results in substantial harm.").

Accordingly, Plaintiffs have not met their burden in showing that Defendants were deliberately indifferent by failing to follow MMC's discharge instructions.

> v.   Attempted Resuscitation of Addington

Plaintiffs state that Defendants delayed treatment while Addington was dying in the medical observation cell on April 1, 2018. Record Document 89 at 17. According to Plaintiffs, it was documented that Addington refused his meal at 9:30 a.m. and then was found unresponsive

---

[20] As stated above, diabetic snacks are used to counter low blood sugar; there is no evidence that Addington had issues with low blood sugar after his discharge from MMC.

[21] Defendants argue that Gabapentin is not advisable for someone with a history of kidney disease or alcohol or drug abuse. Record Document 80-1 at 17 (citing Record Document 80-4 at 45–46). Plaintiffs counter that Defendants were not aware of Addington's medical history to draw this conclusion. Record Document 89 at 16. Regardless, the burden is on Plaintiffs to come forward with evidence to show that Addington not timely receiving Gabapentin after his discharge from MMC posed a substantial risk of harm to him or caused his death. Plaintiffs have failed to do so, and this evidentiary shortcoming is fatal to their claim.

sometime between 1:21 and 1:33 p.m.[22] Plaintiffs contend that there is no evidence that anyone constantly monitored Addington despite the observation cell being right next to Master Control and being equipped with a live-feed camera. Lastly, Plaintiffs point to the fact that Deputy Edwards was unable to administer oxygen by bag valve because Nurse Claunch did not refill the oxygen tank.

The Court begins by noting that Plaintiffs fail to identify any specific officer who failed to monitor Addington. Plaintiffs have not presented evidence that any of the named Defendants were responsible for monitoring Addington's cell or the live-feed camera. Plaintiffs thus have failed to show that any named Defendant was deliberately indifferent in failing to monitor Addington. *See Woods v. Edwards*, 51 F.3d 577, 583 (5th Cir. 1995) ("In order to state a cause of action under section 1983, the plaintiff must identify defendants who were either personally involved in the constitutional violation or whose acts are causally connected to the constitutional violation alleged.").

Plaintiffs accuse Nurse Claunch of negligence for failing to refill the oxygen tank. According to Nurse Claunch, deputies usually notified her if the oxygen tank was low and then she would replace it. Record Document 89-5 at 13–14. Even if Plaintiffs are correct that Nurse Claunch was negligent in failing to keep the oxygen tank filled with oxygen, the law is clear that "[u]nsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute

---

[22] Plaintiffs' statement that Addington was found unresponsive at 1:20 p.m. misstates the evidence. The exact time that Addington was found unresponsive has not been established by Plaintiffs. The evidence shows that Deputy David Edwards was notified to check on Addington at approximately 1:21 p.m. Before going to Addington's cell, Deputy Edwards gathered glucose testing equipment to bring to Addington's cell. *See* Record Document 89-16. The next time mentioned in Deputy Edwards's report was when Sergeant Wells was summoned to Addington's observation cell at 1:33 p.m. As such, Plaintiffs' evidence establishes that Addington was found unresponsive sometime between 1:21 and 1:33 p.m. *See id.*

deliberate indifference." *Gobert*, 463 F.3d at 346. This alleged failure does not rise to the level of an Eighth Amendment violation considering Plaintiffs' allegation that Nurse Claunch was merely negligent. *See* Record Document 89 at 17–18.

### III.    Supervisor Liability & Official Capacity Claims

Plaintiffs also allege that Sheriff Sexton and Warden Lewis are liable in their official capacities[23] as well as individually in their supervisory capacities for "failing to promulgate appropriate customs and policies to ensure BDCC staff provided inmates with adequate medical care."[24] Record Document 89 at 4, 19–20. Common to both official capacity claims and supervisory claims is the requirement that Plaintiffs connect the existence of a policy or widespread and settled practice to a constitutional violation. *Baughman v. Hickman*, 935 F.3d 302, 311 (5th Cir. 2019). In other words, Plaintiffs must demonstrate that Defendants "knew the jail's system was so deficient as to expose prisoners to substantial risk of significantly unmet serious medical needs—i.e., was unconstitutional—and failed to properly attempt to correct it, *and* . . . [the] action or inaction in this respect caused [Addington's] injuries." *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987). "A failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequence of not adopting a policy will be a deprivation of constitutional rights." *Porter*, 659 F.3d at 446 (citation omitted). Importantly, the Fifth Circuit has held that "the existence of a

---

[23] "Official capacity suits generally represent another way of pleading an action against an entity of which an officer is an agent." *Burge v. Parish of St. Tammany*, 187 F.3d 452, 466 (5th Cir. 1999). In this case, the entity would be the Webster Parish Sheriff's Office ("WPSO"), a local governing body capable of being sued for damages under § 1983. *See id.*; *Lewis v. Clarke*, 137 S. Ct. 1285, 1290–91 (2017); *Short v. Gusman*, 806 F. App'x 264, 267 (5th Cir. 2020).

[24] Plaintiffs do not allege that Sheriff Sexton and Warden Lewis participated in or directly caused Addington's death. Therefore, Plaintiffs can only prevail in their individual capacity claims against them if they are liable in their supervisory roles.

constitutionally deficient policy [or] [practice] cannot be inferred from a single wrongful act," unless the policy itself violates the constitution. *Thompkins*, 828 F.2d at 304.

Unfortunately for Plaintiffs, they have failed to identify any policy that itself is unconstitutional and the moving force behind Addington's death. Further, Plaintiffs have "adduced no evidence . . . [BDCC's] treatment system had ever actually failed to deliver necessary and appropriate medical care to any other inmate, or that [Defendants] [were] otherwise actually informed or consciously believed that the polic[ies] would expose prisoners to substantial risk of significantly unmet serious medical needs." *Id.* Defendants cannot be held liable under a policy or custom theory when the record at best indicates "that the system may have failed [only] in [Addington's] one particular instance." *Id.* Ultimately, there is no evidence that Defendants knew of a problem with diabetic inmates failing "to participate in their own care and, as a consequence, suffering serious medical ramifications." *Hahn v. Walsh*, 762 F.3d 617, 638 (7th Cir. 2014). Defendants thus are entitled to summary judgment for these claims.

## IV.   <u>Louisiana Law Claims</u>

In addition to their § 1983 claims, Plaintiffs allege that Addington's death was the result of negligence. Record Document 89 at 21–22. As stated above, a jury could reasonably conclude that Sergeant Wells was deliberately indifferent by showing a wanton disregard to Addington's medical needs. For the same reasons, Plaintiffs have created a dispute of material fact as to whether Sergeant Wells was negligent under Louisiana law. However, the allegations against the other Defendants require further examination. *See id.*

In Louisiana, "[p]rison authorities owe a duty of reasonable care to protect inmates from harm" and "to provide inmates with reasonable medical care." *Harper v. Goodwin*, 41,053 (La. App. 2 Cir. 5/17/06); 930 So. 2d 1160, 1163. Louisiana negligence claims are governed by a duty-

risk analysis under Louisiana Civil Code article 2315, which requires the plaintiff to prove the following:

> (1) the conduct in question was the cause-in-fact of the resulting harm;
>
> (2) defendant owed a duty of care to plaintiff;
>
> (3) the requisite duty was breached by the defendant;
>
> (4) the risk of harm was within the scope of protection afforded by the duty breached.

*Stroik v. Ponseti*, 96-2897 (La. 9/9/97); 699 So. 2d 1072, 1077; *see Audler v. CBC Innovis, Inc.*, 519 F.3d 239, 249 (5th Cir. 2008) (stating a fifth element: actual damages) (quoting *Lemann v. Essen Lane Daiquiris, Inc.*, 2005-1095 (La. 3/10/06); 923 So. 2d 627, 633). A plaintiff must prove every element, "including medical causation, by a preponderance of the evidence." *Hutchinson v. Shah*, 94-0264 (La. App. 1 Cir. 12/22/94); 648 So. 2d 451, 452, *writ denied sub nom.*, *Hutchinson v. Shan*, 95-0541 (La. 4/21/95); 653 So. 2d 570; *see Bedingfield ex rel. Bedingfield v. Deen*, 487 F. App'x 219, 229–30 (5th Cir. 2012) (citing *Mathieu v. Imperial Toy Corp.*, 94-0952 (La. 11/30/94); 646 So. 2d 318, 322).

"Cause-in-fact is generally a 'but for' inquiry; if the plaintiff probably would not have sustained the injuries but for the defendant's substandard conduct, such conduct is a cause-in-fact." *Faucheaux v. Terrebonne Consol. Gov't*, 615 So. 2d 289 (La. 1993). "To the extent that the defendant's actions had something to do with the injury the plaintiff sustained, the test of a factual, causal relationship is met." *Id.* In other words, "the inquiry is [d]id the defendant contribute to the plaintiff's harm or is the defendant a cause of the plaintiff's harm?" *Roberts v. Benoit*, 605 So. 2d 1032, 1042 (La. 1991) (internal quotation marks and citation omitted).

"An alternative method for determining cause in fact, which is generally used when multiple causes are present, is the 'substantial factor' test." *Id.* (citation omitted). "Under this test, cause in

fact is found to exist when the defendant's conduct was a 'substantial factor' in bringing about plaintiff's harm." *Id.* (citation omitted). "Under either method, it is irrelevant in determining cause in fact whether the defendant's actions were lawful, unlawful, intentional, unintentional, negligent or non-negligent." *Id.* (citation omitted). "Rather, the cause in fact inquiry is a neutral one, free of the entanglements of policy considerations—morality, culpability or responsibility—involved in the duty-risk analysis." *Id.* (citation omitted).

Here, the autopsy report lists Addington's cause of death as "Acute Renal Failure due to Diabetic Ketoacidosis Complicating Hypertensive Cardiovascular Disease." Record Document 80-28 at 3. Unfortunately for Plaintiffs, they have presented no evidence that but for Nurse Claunch's, Sheriff Sexton's, or Warden Lewis's actions or inactions, Addington would not have died. Although BDCC's failure to properly document Addington's MAR is concerning, there is no evidence that Addington's incomplete MAR caused his death or that a properly filled out MAR would have saved Addington's life. As stated above, there is no evidence that Defendants prevented Addington from testing his glucose and/or accessing his insulin. Importantly, Addington had constant access to glucose testing equipment and his insulin shots prior to his hospitalization, even if he was required to be proactive in his treatment regimen.

A glaring omission by Defendants was the alleged failure to ensure that the oxygen tank was stocked with oxygen. Nevertheless, Plaintiffs have failed to present any evidence to show but for Defendants' failure to properly stock the oxygen tank, Addington would not have died. Plaintiffs also have failed to produce evidence to show that such failure played a substantial factor in Addington's death. *See Grafton v. Bailey*, No. CV 13-2940, 2018 WL 2325410, at *12 (W.D. La. May 22, 2018).

In contrast, Defendants cite to Dr. Heard's declaration in which he states his opinion that Addington was likely already dead by the time deputies entered his cell due to the fact that Addington was not breathing and that his body was stiff, which could be evidence that rigor mortis had set in. Record Document 80-12 ¶ 43. Although a jury could find Dr. Heard to be biased, Plaintiffs have not attached competent summary judgment evidence upon which a jury could base a contrary conclusion.[25] Thus, Plaintiffs have failed to come forward with any evidence that a fully stocked oxygen tank could have made a difference in this case. *See Grafton*, 2018 WL 2325410, at *12 (dismissing plaintiffs' negligence claim because they failed to attach evidence that "CPR could have made any difference"). This failure is fatal to Plaintiffs' claims. *See Hutchinson*, 648 So. 2d at 452.

In short, based on the summary judgment record, Plaintiffs have failed to create a genuine issue of material fact as to whether Nurse Claunch's, Sheriff Sexton's, or Warden Lewis's actions or inactions caused Addington's death. Therefore, they are entitled to summary judgment as to Plaintiffs' Louisiana law negligence claims.

Plaintiffs do, however, advance the theory of vicarious liability. Record Document 1 ¶ 59. Pursuant to Louisiana Civil Code article 2320, "[m]asters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed." La. Civ. Code art. 2320. "The sheriff, in his official capacity, is the proper party to sue for the torts of his employees." *See Grafton*, 2018 WL 2325410, at *13 (citing La. R.S. § 42:1441.3(E); *Jenkins v. Jefferson Par. Sheriff's Off.*, 402 So. 2d 669, 669 (La. 1981)). Considering

---

[25] Plaintiffs contend that Dr. Heard, as a Defendant, has every reason to bolster Defendants' case with his opinions. Record Document 89 at 18. At the summary judgment stage, however, the Court does not weigh evidence. Plaintiffs have not objected to this evidence as inadmissible, nor have they submitted competent summary judgment evidence to contradict Dr. Heard's medical opinion.

that Sergeant Wells has not shown an entitlement to judgment as a matter of law as to the negligence claims against him, Plaintiffs' vicarious liability claim remains viable against Sheriff Sexton. Defendants did not mention vicarious liability in their briefing. As such, Sheriff Sexton has failed to show that he is entitled to judgment as a matter of law on this claim and must remain in this suit in his official capacity.

## CONCLUSION

Based on the foregoing reasons, Defendants' motion for summary judgment [Record Document 80] is **GRANTED IN PART** and **DENIED IN PART**.

It is **DENIED** as to Plaintiffs' Eighth Amendment and Louisiana law claims against Sergeant Wells to the extent they relate to the care Addington did or did not receive after his discharge from MMC.

It is **DENIED** as to Plaintiffs' Louisiana law vicarious liability claim against Sheriff Sexton in his official capacity.

It is **GRANTED** as to all other claims subject to this motion for summary judgment; these claims are **DISMISSED WITH PREJUDICE**.

The Clerk of Court is directed to terminate Debra Claunch and Warden John Lewis as defendants in this matter.

**THUS DONE AND SIGNED** this 31st day of March, 2022.

ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE